**CHICAGO FIRE FIGHTERS UNION
LOCAL NO. 2, et al., Plaintiffs,**

v.

**Harold WASHINGTON, et al.,
Defendants.**

No. 87 C 7295.

United States District Court,
N.D. Illinois, E.D.

May 7, 1990.

Stephen B. Horwitz and Robert S. Sugarman, Jacobs Burns Sugarman & Orlove, Chicago, Ill., for plaintiffs.

Darka Papushkewych, Judson H. Miner and Jay M. Kertez, Corp. Counsel, City of Chicago and Sarah Vanderwicken, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

In this case white members of the Chicago Fire Department ("CFD") bring claims under 42 U.S.C. Sections 1981 and 1983 alleging that the CFD's promotional deci-

sions subjected them to reverse discrimination in violation of the Equal Protection Clause. Plaintiffs Chicago Fire Fighters Union Local No. 2 and some of its white members, and defendants City of Chicago and some of its officers, both have moved for summary judgment.

Our Seventh Circuit Court of Appeals recently agreed with a fellow judge in this district that "[n]o area of constitutional law has been more unsettled than that gathered under the rubric of 'affirmative action.'" *Cygnar v. City of Chicago*, 865 F.2d 827, 843 (7th Cir.1989) *quoting Cygnar v. City of Chicago*, 652 F.Supp. 287, 297 (N.D.Ill.1986) (Shadur, J.). This court has found the Supreme Court's affirmative action jurisprudence equally abstruse. Although rarely easy to apply, nonetheless, careful consideration of the Court's affirmative action principles compels this court to grant defendants' motion for summary judgment.

## I. BACKGROUND FACTS

The uniformed, non-exempt fire suppression ranks of the CFD include, in ascending order of promotion, the following: Firefighter, Engineer, Lieutenant, Captain, and Battalion Chief. (Defendants' 12[1] Statement at ¶¶ 4–5;[1] Strensland Aff. ¶ 5.)

Plaintiff Chicago Fire Fighters Union Local No. 2 ("Union") is the collective bargaining representative for certain uniformed personnel of the CFD. The individual plaintiffs are white members of the CFD who held the rank of Firefighter or Lieutenant. In their first amended complaint[2] plaintiffs allege that defendants, the City of Chicago ("City") and some of its officers,[3] discriminated against them on the

---

**1.** In moving for summary judgment defendants, in compliance with Local Rule 12(1), filed a statement of material facts as to which defendants contend there is no genuine issue and that entitle them to judgment as a matter of law. Plaintiffs, however, failed to respond to defendants' statement as required by Local Rule 12(m). Instead, plaintiffs filed only a 12(*l*) statement in support of their own motion for summary judgment—a statement which in this instance does not comply with the requirements of Rule 12(m). Therefore, as required by Rule 12(m) all material facts set forth in defendants' 12(*l*) statement will be deemed to be admitted.

Local Rule 12(m); *Bell, Boyd & Lloyd v. Tapy*, 896 F.2d 1101, 1103 (7th Cir.1990).

**2.** On August 25, 1988 plaintiffs filed a Second Amendment to the Complaint, substituting new language for four paragraphs of the first amended complaint.

**3.** Namely, defendant Harold Washington, the late mayor of the City, and Louis Galante and Jesse Hoskins, the Fire Commissioner of the CFD and the Commissioner of the Department of Personnel of the City, respectively. Plaintiffs

basis of race by making certain non-rank-order ("NRO") promotions.

Plaintiffs make two claims. In Count I of the complaint the Firefighter plaintiffs allege that the defendants' policy of NRO promotions prevented them from being promoted to the next highest rank—Fire Engineer. In Count II the Lieutenant plaintiffs aver that the defendants' conduct precluded them from being promoted to their next highest rank—Fire Captain.

On January 19, 1985 the City, under the auspices of the CFD and the Department of Personnel, administered a two-part Fire Engineer's examination. 1,035 Firefighters interested in promotion to Engineer took the first part of the Engineer's examination—a written test. The Firefighters passing the written test were then given a practical "hands-on" test, or "simulator" test. Based on the results of this simulator test defendants posted the Engineer Promotional List, a list which ranked each Firefighter in accordance with the score achieved on the simulator test.

In a similar fashion, in September of 1986 the City also administered a two-part promotional examination for Fire Captain. 543 Fire Lieutenants completed the written portion of the examination, and about 506 subsequently completed an oral portion. Again, based upon the results of these tests defendants posted a Captain Promotional List, a list which ranked the Lieutenants based upon their scores on the examination.

Plaintiffs object neither to the examinations they took nor to the promotional rosters derived therefrom. On the contrary, plaintiffs contend that both the Engineer and the Captain examinations were carefully scrutinized to assure their validity as a promotional device. What plaintiffs protest is defendants' decision to make NRO promotions based upon race.

The NRO promotions at issue occurred for promotion both to Fire Engineer and Fire Captain. In June of 1987 Jesse Hoskins, the City's Commissioner of Personnel, informed Louis Galante, CFD Commission-er, that the third set of promotions from the Engineer Promotional List "should be made on an affirmative action basis, with the goal that 20% of the persons promoted to Engineer would be Black and additional 5% of those promoted would be Hispanic." (Defendants' Exhibit E.) On August 6, 1987 defendants issued an order certifying 56 Firefighters for the rank of Engineer. Eight Firefighters waived or otherwise declined promotion to Engineer, leaving 48 Firefighters identified for promotion. Pursuant to Commissioner Hoskins' directive the last eight Firefighters identified in the promotion order, all of whom were black, were promoted out of rank order—that is, were lower in rank on the Engineer Promotional List than the Firefighter plaintiffs.

Likewise, in July of 1987 Commissioner Hoskins informed CFD Commissioner Galante that promotions from the Captain Promotional List should be made with the goal of promoting 20% black and 5% Hispanic candidates. (Defendants' Exhibit F.) On October 1, 1987 defendants issued an order certifying 24 Lieutenants for the rank of Captain. The first 23 Lieutenants named to the rank of Captain were in rank order from the Captain Promotional List. The last Lieutenant, however, an Hispanic–American, was promoted out of rank order —*viz*, was lower in rank on the Captain Promotional List than the two Lieutenant plaintiffs.

Plaintiffs brought this suit under 42 U.S.C. Sections 1981 and 1983, alleging that the NRO promotions violated the Equal Protection Clause.

## II. DISCUSSION

Because the court considers this case on cross motions for summary judgment, neither party can prevail unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on these cross motions for

---

bring suit against these individual defendants     both in their official and individual capacities.

summary judgment the court must believe the evidence of the nonmovant, drawing all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

When confronted with a motion for summary judgment, a party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The party must do more than simply "show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (footnote omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.*, 475 U.S. at 587, 106 S.Ct. at 1356.

### A. *Plaintiffs' Equal Protection Claim*

■ The Equal Protection Clause of the Fourteenth Amendment provides that "no State shall ... deny to any person within its jurisdiction the equal protection of the laws." To determine whether the City's affirmative action policy at issue violates the Equal Protection Clause this court must subject it to "strict scrutiny." *City of Richmond v. Croson*, 488 U.S. 469, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (1989). To survive this heightened scrutiny the policy must be justified by a compelling governmental interest and must be narrowly tailored to serve that interest. *Id.*

### 1. *Justification by a Compelling Governmental Interest*

■ To survive the first prong of the strict scrutiny test the City's affirmative action policy must be justified by a compelling interest. Clearly, the City would have a compelling interest in remedying past (and present) racial discrimination in making promotional decisions at the CFD—

which is precisely the interest which defendants assert. *Croson*, 109 S.Ct. at 720; *United States v. Paradise*, 480 U.S. 149, 107 S.Ct. 1053, 1065, 94 L.Ed.2d 203 (1987); *Wygant v. Jackson Board of Education*, 476 U.S. 267, 106 S.Ct. 1842, 1853, 90 L.Ed.2d 260 (1986) (O'Connor, J., concurring).

The Court has made clear that a "contemporaneous or antecedent finding of past discrimination by a court or other competent body is *not* a constitutional prerequisite to a public employer's voluntary agreement to an affirmative action program." *Wygant*, 476 U.S. at 189, 106 S.Ct. at 1855 (O'Connor, J., concurring) (emphasis added). However, the Court has insisted upon "some showing of prior discrimination by the governmental unit involved before allowing limited use of racial classifications in order to remedy such discrimination." *Wygant*, 476 U.S. at 274, 106 S.Ct. at 1847 (plurality).

In *City of Richmond v. Croson*, 488 U.S. 469, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (1989), the Court clarified the showing that defendants must make in order to justify remedial relief. The Court held that a district court must make a factual determination that a governmental body had a "strong basis in evidence for its conclusion that remedial action was necessary." *Croson*, 109 S.Ct. at 724, 730, *quoting Wygant*, 476 U.S. at 277, 106 S.Ct. at 1848 (plurality). Only then would the governmental entity have a compelling interest in favoring one race over another. *Croson*, 109 S.Ct. at 723.

Although the defendants in this case must present a strong basis for concluding that remedial action was appropriate, the ultimate burden nonetheless remains with the plaintiffs to demonstrate the unconstitutionality of the NRO promotions—that the defendants' evidence failed to support an inference of prior discrimination or that the remedial relief chosen was not "narrowly tailored" to its purpose. *Wygant*, 476 U.S. at 277–78, 293, 106 S.Ct. at 1849, 1857.

■ In making their showing defendants cannot rely solely upon a generalized asser-

tion that there has been past discrimination in the CFD, as this would provide no guidance for the department to determine the precise scope of the injury it seeks to remedy and thus would be insufficient to justify the affirmative action at issue. *Croson*, 109 S.Ct. at 723–4. Defendants rely upon four bases to justify their affirmative action policy: (1) the obligations of a previous order of settlement and the history of litigation that produced it; (2) the City's contract with the Union requiring the CFD to reach as quickly as is reasonably possible a level as close to 45% minority representation in each rank of the CFD as is "reasonably achievable"; (3) the disparities between minority representation in the Engineer and Captain ranks and representation in the ranks immediately below them; and (4) the discriminatory adverse impact of the Engineer examination on minorities.

### a. *The McGarr Order* [4]

In 1973 the United States Department of Justice brought suit against the City of Chicago alleging that the hiring and promotion practices of the CFD unlawfully discriminated against blacks and Hispanics. (Cole Aff. ¶ 5.) At that time less than 5% of the uniformed personnel in the CFD were black or Hispanic. (Cole Aff. ¶ 6.)

The same year the suit was filed the Seventh Circuit Court of Appeals entered an injunction pending appeal against the City on the hiring issue. At that point, the City concluded that it would not be able to successfully defend against the Department of Justice's discriminatory hiring claims. Accordingly, the City entered into a consent decree which established an interim 50% minority (black and Hispanic) hiring ratio and a long range goal requiring the City to substantially increase the minority composition of the CFD. (Cole Aff. ¶ 7.)

Because little hiring took place between 1974 and 1978, the interim hiring goal established by the 1974 consent decree had a limited immediate effect in increasing the proportion of blacks and Hispanics in the CFD—by September 1978, the CFD contained 9% blacks and Hispanics. Thus, supplemental hiring orders were entered providing that additional hiring be done on the basis of a 50% minority ratio. (Cole Aff. ¶ 8; Defendants' Exhibit A.)

With respect to the issue of promotions, the Justice Department challenged as discriminatory the promotional examinations and eligibility lists that had been used in the 1960's and early 1970's. (Cole Aff. ¶ 9.) Although the district court ruled in the City's favor, the Court of Appeals reversed and remanded for further proceedings. (Cole Aff. ¶ 10.)

In 1978, prior to the completion of the remand proceedings, the City's Department of Personnel prepared and administered new promotional examinations for each rank in the CFD. (Cole Aff. ¶ 11.) In early 1980 the Department of Justice advised the City that it intended to file a new lawsuit challenging all four of the newly administered promotional examinations on the grounds that they had a severe adverse impact against minority candidates. (Cole Aff. ¶ 13.)

In response to this latest lawsuit representatives of the CFD, the City's Department of Personnel and the City's Law Department convened a series of meetings to analyze the strengths and weaknesses of the Justice Department's case. Those taking part in that meeting concluded that the examinations had a severe adverse impact on minority candidates, that the examinations had not been adequately validated, especially not for use in ranking candidates, and that the efficiency ratings (one of the components of a candidate's final score) were racially discriminatory. (Cole Aff. ¶ 14.)

Based upon this assessment, the high costs of litigation, and a belief that the promotion process had been unfair to black and Hispanic members of the CFD, the City decided to settle the lawsuit with the Justice Department. (Cole Aff. ¶ 15.) The

---

**4.** As plaintiffs correctly note, the Order entered by Judge McGarr of this District does not bar this action because plaintiffs did not in any way join in that agreement. *Martin v. Wilks*, —— U.S. ——, 109 S.Ct. 2180, 2188, 104 L.Ed.2d 835 (1989).

resulting settlement agreement established a 1–to–4 minority/white promotion ratio as an interim requirement for promotions to the ranks of Lieutenant and Engineer until new, validated promotional examinations could be administered and new promotional lists posted. Additionally, the agreement initiated a long-term promotional goal which would require the City to substantially increase minority participation at each rank of the CFD so that the minority composition of each rank would mirror the racial composition of the preceding rank. (Cole Aff. ¶ 16.)

This settlement agreement was approved by the district court, Honorable Frank J. McGarr, and incorporated into an Order of Settlement entered March 31, 1980 ("McGarr Order"). (Cole Aff. ¶ 17.) The McGarr Order states that "defendants, as a long range goal, shall seek to promote black and Hispanic persons in sufficient numbers so as to increase substantially the minority composition in each of the promotional ranks [of the CFD] with the objective that each such rank become more representative of the racial and ethnic composition of the rank or ranks from which promotion to it are made." (McGarr Order at 2–3, Defendants' Exhibit B.)

Defendants "technically admit" that no formal findings of discrimination were made in the course of either of the two lawsuits which ultimately were resolved by the McGarr Order. (Defendant's 12[m] Statement at ¶ 1.) Indeed, because it reflected settlement of the Justice Department's latest suit against the City, the McGarr Order itself makes no formal finding of past discrimination. Moreover, as plaintiffs aptly point out, in accepting the terms of a consent decree "the parties are free to agree on relief more extensive than federal law requires." *Kasper v. Board of Election Commissioners*, 814 F.2d 332, 338 (7th Cir.1987). Therefore, while the consent decree itself may be consistent with the Constitution and laws, any affirmative action plan promulgated pursuant to it may not necessarily be. *See U.S. v. City of Chicago*, 870 F.2d 1256, 1261 (7th Cir. 1989).

Nonetheless, in an attempt to present a formal finding of past discrimination defendants cite the Seventh Circuit's reversal and remand of an earlier district court finding of nondiscrimination. (Defendant's 12[m] Statement at ¶ 1.) In *United States v. City of Chicago*, 573 F.2d 416 (7th Cir. 1978), the Seventh Circuit enjoined permanent promotions based on the 1969 Engineer's, 1970 Lieutenant's, and 1973 Captain's examinations unless such promotions first were offered to minority candidates on the respective lists. 573 F.2d at 429. In providing injunctive relief the court must have believed that the Justice Department had a sufficient likelihood of succeeding on the merits in demonstrating that the promotional examinations at issue discriminated against blacks and Hispanics. *See, e.g., Helene Curtis Industries, Inc. v. Church & Dwight Co.*, 560 F.2d 1325, 1330 (7th Cir.1977). Moreover, the district court had held that the Justice Department had made out a prima facie Title VII case of discrimination based upon the disparate impact of the Engineer, Lieutenant, and Captain exams—a holding which the Court of Appeals did not dispute *per se*, but simply remanded for specific findings of fact. 573 F.2d at 425.

These decisions indicate—without formally so holding—that the City most likely was faced with a prima facie case of racial discrimination. Nonetheless, it warrants reiteration that a formal judicial finding of past discrimination is not a constitutional prerequisite to voluntary agreement to an affirmative action program. *Wygant*, 476 U.S. at 189, 106 S.Ct. at 1855 (O'Connor, J., concurring). As Justice O'Connor cautioned:

The imposition of a requirement that public employers make findings that they have engaged in illegal discrimination before they engage in affirmative action programs would severely undermine public employers' incentive to meet voluntarily their civil rights obligations. This result would clearly be at odds with this Court's and Congress' consistent emphasis on "the voluntary efforts to further the objectives of the law."

*Id.,* 476 U.S. at 290, 106 S.Ct. at 1855 (citations omitted).

Thus, although there exist no formal findings of past discrimination in the CFD, the litigation history of the CFD's past hiring and promotion practices offers at least some evidence of past discrimination. This evidence, when combined with other evidence provided by defendants (discussed below), constitutes a "strong basis" for the conclusion that remedial action was necessary. *Croson,* 109 S.Ct. at 730.

#### b. *The Collective Bargaining Agreement*

The defendants argue that the City's collective bargaining agreement with the Union offers additional support for the City's decision to engage in affirmative action in its promotion process. The union contract requires the City both to comply with decrees and agreements reached in court proceedings and also to have transfer and promotion policies with the goal of including blacks and Hispanics in all categories and ranks of the CFD to "reach as quickly as is reasonably possible a level as close to 45% as is reasonably achievable." (Union Contract, Appendix G, attached as Plaintiffs' Exhibit 3.) This same language has been in every contract between the City and the Union from 1980 to the present. (Strensland Aff. ¶ 12.)

The existence of an affirmative action goal in a collective bargaining agreement alone may not be sufficient to support a factual determination that the CFD had a "strong basis" for its conclusion that NRO promotions were necessary. Nonetheless, the affirmative action provisions of the Union's collective bargaining agreement corroborate other more direct evidence of past discrimination in the ranks of the CFD.

#### c. *Minority Underrepresentation Statistics*

Defendants' statistics reflecting minority underrepresentation in the ranks of the CFD provide the strongest evidence of past discrimination in the CFD.

The Court has held that a statistical imbalance sufficient for a Title VII prima facie case would satisfy the constitutional requirement that the City have a "strong basis" for believing that remedial action was required. *Croson,* 109 S.Ct. at 724; *Wygant,* 476 U.S. at 274–5, 106 S.Ct. at 1847 (plurality); *Johnson v. Transportation Agency, Santa Clara County, Cal.,* 480 U.S. 616, 107 S.Ct. 1442, 1461–2, 94 L.Ed.2d 615 (1987) (O'Connor, J., concurring in the judgment); *Hazelwood School District v. United States,* 433 U.S. 299, 307–308, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977) (where "gross statistical disparities can be shown, they alone in a proper case may constitute prima facie proof of a pattern or practice of discrimination" under Title VII).

■ The parties to this case dispute whether the appropriate statistical comparisons here are between the percentage of minorities in the relevant ranks of the CFD and the general labor population, or between the percentage of minorities in a particular rank of the CFD and the rank immediately below it. The latter comparison is correct.

As the Supreme Court has stated, "[w]hen special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value." *Hazelwood,* 433 U.S. at 308 n. 13, 97 S.Ct. at 2742 n. 13. Thus, where special qualifications are required the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be "the number of minorities qualified to undertake the particular task." *Croson,* 109 S.Ct. at 725.

In this case comparisons to the general labor population in Chicago are inappropriate. The relevant statistical pool for promotion to Engineer is the group of Firefighters, as all promotions are made from that group—the next lowest rank. Similarly, the qualified labor pool for promotion to Captain is the group of Lieutenants, because all promotions to Captain are made from that rank. If there is a significant statistical disparity between the number of qualified minority Firefighters willing and able to serve as Engineers and the number

of minorities actually serving as Engineers, an "inference of discriminatory exclusion could arise." *Croson,* 109 S.Ct. at 729, *citing Bazemore v. Friday,* 478 U.S. 385, 398, 106 S.Ct. 3000, 3008, 92 L.Ed.2d 315 (1986) *and Teamsters v. United States,* 431 U.S. 324, 337–339, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977). A similar inference could arise by comparing the number of qualified minority Lieutenants willing and able to serve as Captains and the number of minorities actually serving as Captains.

It is undisputed that as of June 30, 1987 only 11.0% of the total CFD Engineers were black or Hispanic. However, blacks and Hispanics comprised 29.2% of the CFD's Firefighters. Similarly, although minorities comprised only 3.6% of the CFD's Captains, 13.6% of the CFD's Lieutenants were black or Hispanic. (Defendants' 12[1] Statement at ¶ 5, *citing* Stensland Aff. at ¶ 19.)

■ Without presenting any evidence to the contrary, plaintiffs merely assert that these figures are not statistically significant and thus fail to make out a prima facie case of racial discrimination. However, as defendants correctly note, a difference of greater than two or three standard deviations between the expected percentage and the observed percentage of minorities in a relevant labor pool can be sufficient to support an inference of discrimination. *See Hazelwood,* 433 U.S. at 308 n. 14, 97 S.Ct. at 2742 n. 14.

Defendants have presented uncontradicted evidence that in 1987 the difference between the expected percentage of blacks and Hispanics in the Engineer rank given the percentage in the Firefighter rank was 8.7 standard deviations—"well beyond the level of chance." (Joyce Supp.Aff. ¶ 4.) Similarly, the difference between the expected percentage of blacks and Hispanics in the Captain rank given the percentage in the Lieutenant rank was 3.96 standard deviations—again "well beyond the possible effect of chance." (Joyce Supp.Aff. ¶ 2.)

Likewise, defendants aptly point out that a showing that a disparity between the number of minorities in relevant labor pools is statistically significant at the .05

level—meaning that the odds are one in twenty that the result occurred by chance—is sufficient to support an inference of discrimination. *See Segar v. Smith,* 738 F.2d 1249, 1282–83 (D.C.Cir. 1984). Again, defendants have presented uncontradicted evidence that the disparity between the actual and expected number of minority Engineers given the racial composition of the Firefighter rank, and the disparity between the actual and expected number of minority Captains given the racial composition of the Lieutenant rank, is statistically significant well below the .05 level. (Joyce Supp.Aff. ¶¶ 3–4.)

■ It could be argued (but plaintiffs do not) that defendants' statistics are too simplistic, as they contain only one independent variable: race. *See Allen v. Seidman,* 881 F.2d 375, 378–80 (7th Cir.1989). However, a simple statistical comparison can support a prima facie case of discrimination, especially when an opposing party fails to conduct a more sophisticated comparison. *Id.* at 380; *Regner v. City of Chicago,* 789 F.2d 534, 538 (7th Cir.1986); *Aguilera v. Cook County Police & Corrections Merit Board,* 760 F.2d 844, 846 (7th Cir.1985).

When confronted with a motion for summary judgment, a party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. at 2553. Plaintiffs have failed to do this with regard to defendants' statistical evidence of minority underrepresentation in the relevant ranks of the CFD. Thus, this court accepts and finds compelling defendants' statistical evidence of past discrimination in the CFD.

d. *Evidence of Adverse Impact of the Engineer Examination on Minorities*

Finally, to show that they had a compelling interest in instituting affirmative action promotions defendants present evidence that the 1985 Engineer examination

had an adverse impact on minority candidates when used as a rank order device.

█ It is clear that a prima facie case of racial discrimination may be established by showing that a particular examination has an adverse racial impact on minority candidates. *See, e.g., Bushey v. N.Y. State Civil Service Commission,* 733 F.2d 220, 224–25 (2d Cir.1984). A plaintiff seeking to make out a prima facie case typically applies to test results the "four-fifths" rule of the Equal Employment Opportunity Commission's Uniform Guidelines on Employment Selection, 29 C.F.R. § 1604.4(D).[5] *Id.* at 225–26.

Defendants in this case admit that neither the simulator portion of the Engineer examination nor either portion of the Captain examination had an overall adverse impact upon minority candidates. (Defendants' 12[m] Statement at ¶¶ 10, 13; Joyce Aff. at 126–27.) They present uncontradicted evidence, however, that starting with the third promotion to Engineer from the 1986 Engineer eligibility list the minority success rate of promotion was less than 80% of the white success rate of promotion, and thus under the "four-fifths" rule the Engineer examination had an adverse impact on minority candidates when used as a rank order device. (Joyce Aff. at ¶ 10.)

Defendants go on to note that if a selection device has more of an adverse impact when used for a ranking device than it does otherwise (e.g. on a pass/fail basis), then it must be validated specifically for use in rank order selection. (Defendants' Mem. in Support at 19–20; Requests to Admit and Plaintiffs' Responses to Requests for Admission, Exhibit O at ¶ 2.) Defendants then present expert evidence that the Engineer examination was not and could not have been validated for making rank order promotions. (Barrett Aff. at ¶ 17.)

Plaintiffs assert, however, that there is a genuine issue of material fact as to whether the Engineer examination was validated

for use as a rank order device. Plaintiffs cite the deposition of Robert T. Joyce, the City's Deputy Commissioner of Personnel, who stated, based upon a pilot study, that "we felt that [the simulator portion of the Engineer examination] could be satisfactorily used as a ranking device." (Joyce Dep. at 48.)

Mr. Joyce's testimony must be viewed in its entirety, however. Later, when asked specifically whether the Engineer's examination in fact even had been validated for the purpose of rank order assignments, Mr. Joyce responded "no." (Joyce Dep. at 246.) Indeed, corroborating defendants' expert, Mr. Joyce unequivocally stated that the Engineer examination was not and, given the circumstances faced by the City, could not have been validated for making rank order assignments. (Joyce Dep. at 246; Barrett Aff. at ¶ 17; *see also* Shepherd Dep. at 290–91.)

Thus, there is no genuine issue of material fact that at least the Engineer examination had an adverse impact on minority candidates when used as a rank order device and was not (and could not have been) validated for rank order use. The adverse impact of the Engineer examination further convinces this court that the defendants have sufficiently demonstrated a compelling interest justifying affirmative action promotions.

In summary, then, based upon the litigation history of the CFD's past hiring and promotion practices, the affirmative action provisions of the collective bargaining agreement between the City and the Union, the significant disparities between minority representation in the Engineer and Captain ranks and representation in the ranks immediately below them, and the discriminatory adverse impact of the Engineer examination on minorities, this court concludes that there is no genuine issue of material fact that the City had a strong basis in

---

**5.** 29 C.F.R. § 1607.4(D) provides in relevant part: "A selection rate for any race ... which is less than four-fifths (⅘) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforce-

ment agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact."

evidence for its conclusion that its affirmative actions promotions were necessary.

## 2. Narrowly Tailored To Accomplish a Remedial Purpose

However, not only must there be no genuine issue of material fact that plaintiffs had a compelling interest requiring remedial measures, but also the remedy chosen must be narrowly tailored to accomplish its purpose. *Croson*, 109 S.Ct. at 721.

In determining whether the City's affirmative action goals are appropriate this court must look to several factors, including:

> the necessity for the relief and the efficacy of alternative remedies, the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties.

*Paradise*, 107 S.Ct. at 1067. Careful scrutiny of these factors confirms that the City's policy of affirmative action promotions was narrowly tailored to serve its remedial ends.

First, given the City's compelling interest in remedying past discrimination the necessity for relief in this case is great. Moreover, the City determined that "no other approach [other than NRO promotions] would permit meaningful affirmative action progress." (*See* Defendants' Exhibits E and F.) Indeed, as defendants correctly note, since promotions to the ranks of Engineer and Captain could only be made from the ranks below them, a race-neutral method for expanding minority representation in the upper ranks, such as aggressive recruitment, was not possible.

Second, the City's affirmative action goals are sufficiently flexible and limited in duration. The plaintiffs repeatedly characterize the City's affirmative action plan as a 25% "set-aside" for minorities. (*See, e.g.*, Plaintiffs' 12[1] Statement at ¶¶ 15–16.) However, as defendants aptly point out, this characterization is not supported by the evidence. (*Compare* Hoskins Tr. at 31–33, cited by plaintiffs, *to* Defendants' Exhibits E and F.) In fact, it is clear that the affirmative action program at issue consists of a policy, promulgated in mid–1987, under which promotions to the ranks of Captain and Engineer would be made with the "goal" of having 20% offered to black candidates and 5% to Hispanic candidates. (Defendant's Exhibits E and F; Hoskins Dep. at 7.)

By definition, a goal for minority representation is more flexible than an unyielding quota. Moreover, under this particular goal no unqualified black or Hispanic candidate need be offered a promotion. On the contrary, there is no dispute that the black and Hispanic candidates promoted ahead of plaintiffs—all of whom successfully completed their respective examinations—were fully qualified for promotion. (Joyce Aff. ¶¶ 12–13.) In fact, plaintiffs themselves allege that the promotional examinations for the ranks of Engineer and Captain are valid measures of the qualifications for candidates to those ranks. (First Amended Complaint, ¶¶ 12, 27.)

It also is uncontested that the City's affirmative action goals are of limited duration—applied for only three years or until a specified number of promotions have been made from the promotional lists at issue. Moreover, "to insure flexibility and to guarantee that the ratios are used only so long as they are necessary and appropriate, the affirmative action promotional goals will be reevaluated on an annual basis." (Defendant's Exhibit E at 4–5, Exhibit F at 4–5.)

Third, given the disparity between minority representation in the Engineer and Captain ranks and representation in the ranks immediately below them, the City's numerical goals are sufficiently related to the relevant labor market. This is especially true given that the City's stated policy is to review the goals annually to determine whether they are still necessary and appropriate; and in any event the City will eliminate the goals after three years or after a certain number of promotions have been made under them.

Finally, the City's goals neither create a bar to white advancement nor excessively

burden white candidates for promotion. Under the City's policy white candidates will continue to be promoted to the ranks of Engineer and Captain at high levels. Moreover, as the Court has stated, " '[d]enial of a future employment opportunity is not as intrusive as loss of an existing job,' ... and plainly postponement imposes a lesser burden still." *Paradise*, 107 S.Ct. at 1073, *quoting Wygant*, 476 U.S. at 282–83, 106 S.Ct. at 1851 (plurality).

Thus, the court holds that there is no genuine issue of material fact that the City's affirmative action goals at issue here were narrowly tailored to their remedial purpose. Because this court finds that there can be no significant doubt both that the City's affirmative action goals were justified by a compelling governmental interest and also that the goals were narrowly tailored to serve that interest, summary judgment must be granted in favor of the defendants.

### B. *Plaintiffs' Section 1981 Claim*

■ Apart from equal protection analysis, plaintiffs' Section 1981 claim is untenable for another reason. In *Patterson v. McLean Credit Union*, —— U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the Supreme Court recently addressed the issue of whether a promotion claim is actionable under Section 1981. The Court held:

> [T]he question whether a promotion claim is actionable under § 1981 depends upon whether the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer. If so, then the employer's refusal to enter the new contract is · actionable under § 1981.... Only where the promotion rises to the level of an opportunity for a *new and distinct relation* between the employee and the employer is such a claim actionable under § 1981.

109 S.Ct. at 2377 (emphasis added). *Patterson* requires this court to grant summary judgment in defendants' favor on plaintiffs' Section 1981 claims for two reasons.

First, plaintiffs' first amended complaint, filed and further amended before *Patterson* was decided, contains neither allegations nor facts indicating that promotion to the ranks of Engineer or Captain would result in a "new and distinct" relationship between the plaintiffs and the CFD.[6] Plaintiffs have failed to amend their complaint to allege such facts. This is fatal to their Section 1981 claims. *See Greggs v. Hillman Distributing Co.*, 719 F.Supp. 552, 555 (S.D.Tex.1989).

Second, on summary judgment, plaintiffs—who of course bear the burden of proof on their Section 1981 claim—must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact in this case which requires trial. Plaintiffs have designated no facts whatsoever indicating that their promotions would have created a new and distinct relation with the CFD. Therefore, summary judgment must be entered against plaintiffs on the Section 1981 claims. *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553.

### C. *Qualified Immunity*

■ Finally, regardless of this court's ruling on equal protection liability, Louis T. Galante and Jesse Hoskins are entitled to qualified immunity from suit in this case.

Under the doctrine of qualified immunity public officials "performing discretionary functions are protected against suits for damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have know." *Doe v. Bobbitt*, 881 F.2d 510, 511 (7th Cir.1989). Commissioners Galante and Hoskins allegedly were involved with the decision to institute the affirmative action goals at issue as of the middle of 1987. (*See* Defendants' Exhibits E and F.) At that time (as now) the most recent Supreme Court decisions upheld affirmative action plans which were narrowly tailored to serve proper remedial purposes. *See, e.g., Paradise*, 107 S.Ct. at 1074.

As discussed above, when the City instituted its affirmative action goals: (1) the

---

**6.** *See* Second Amendment to the Complaint, filed August 25, 1988.

City was bound by the McGarr Order to "promote black and Hispanic persons in sufficient numbers so as to increase substantially the minority composition in each of the promotional ranks of the Chicago Fire Department"; (2) the City had a collective bargaining agreement with the Union setting a goal of 45% minority representation throughout the CFD; and (3) there was a significant statistical disparity between the proportion of minority members in the Engineer and the Captain ranks of the CFD compared to the proportion in the ranks immediately below them.

Moreover, also as discussed above, the City affirmative action plan created the "goal" that 20% of promotions to Engineer and Captain be given to black candidates and 5% to Hispanic candidates. The goal was to be of limited duration. Moreover, no unqualified black or Hispanic candidates would be offered NRO promotions.

Given these facts a reasonable fire commissioner or personnel commissioner could have concluded that he could take race into consideration for a limited reorganization of the Engineer and Captain rank of the CFD. *See Auriemma v. Rice,* 895 F.2d 338, 343–44 (7th Cir.1990); *Cygnar,* 865 F.2d at 844.

## III. CONCLUSION

Because the pleadings, deposition testimony, answers to interrogatories, and affidavits show that there is no genuine issue as to any material fact in this case and that the defendants are entitled to a judgment as a matter of law, defendants' motion for summary judgment is GRANTED. This case is dismissed in its entirety.