James A. McNAMARA, John J. Sullivan, Thomas R. Miller, Charles W. Lux, William T. King, Charles E. Dineen, Richard A. Graf, Henry T. Scavone and Paul B. Sobczak, Plaintiffs,

v.

CITY OF CHICAGO, a municipal corporation, Richard M. Daley, Raymond E. Orozco, Donald J. Stensland and Glenn Carr, Defendants.

No. 93 C 1098.

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 2, 1994.

---

Kimberly Ann Sutherland, Chicago, IL, for plaintiffs.

J. Paula Roderick, Kelly Raymond Welsh, Jay Michael Kertez, Shona B. Glink, City of Chicago Law Dept., Corp. Counsel, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

CONLON, District Judge.

James A. McNamara, John J. Sullivan, Thomas R. Miller, Charles W. Lux, William T. King, Charles E. Dineen, Richard A. Graf, Henry T. Scavone, and Paul B. Sobczak ("the plaintiffs") sue the City of Chicago ("the city"), Mayor Richard M. Daley, Fire Commissioner Raymond E. Orozco, former Deputy Fire Commissioner Donald J. Stensland, and Personnel Commissioner Glenn Carr ("the individual defendants") for violations of 42 U.S.C. §§ 1981, 1983, and 2000e (Title VII).[1] The plaintiffs are white firefighters employed by the Chicago Fire Department who allege that they are victims of the fire department's affirmative action policies. On August 31, 1994, this court granted the defendants' motion for summary judgment on the issue of qualified immunity and dismissed all of the individual defendants. At the same time, the court denied the plaintiffs' motion for summary judgment on the issue of "liability." See August 31, 1994 Memorandum Opinion and Order, No. 93–1098. Presently before the court are the plaintiffs' motion to reconsider each of the August 31st rulings, as well as the defendants' motion for summary judgment on the Title VII and section 1981 claims.

### BACKGROUND

#### A. History Of Racial Issues In CFD

The Chicago Fire Department's ("CFD") non-exempt fire suppression ranks proceed in the following ascending order of promotion: firefighter, engineer, lieutenant, captain, and battalion chief. This case involves the step between lieutenant and captain. In the early 1970's, the CFD was dominated by

---

1. This suit is consolidated for pretrial purposes before Judge Holderman with six other cases challenging the fire department's promotion practices. See In the Matter of Chicago Firefighter Promotions Consolidated Pretrial Procedure, No. 93 C 3028 (N.D.Ill.Exec.Comm. July 17, 1993). Currently pending before Judge Holderman is the city's motion to consolidate the suits for all purposes.

white males. Galante Aff. ¶ 3. High ranking CFD officials later attributed this to discrimination in hiring, interim appointments of white firefighters to higher positions, and special training opportunities for white firefighters. *Id.* In 1973, the Department of Justice brought suit against the city, alleging that the fire department's hiring and promotional practices discriminated unlawfully against blacks and Hispanics. Cole Aff. ¶ 5. In 1974, the city entered into a consent decree with the United States. The consent decree established an interim 50 percent hiring ratio and a long-term goal to increase substantially the black and Hispanic composition of the CFD to reflect the black and Hispanic composition of the whole city. *Id.* at ¶ 7.

Notwithstanding the consent decree, the CFD black and Hispanic composition remained at only nine percent in September 1978. At that time, the CFD entered into a supplemental hiring order that allocated 120 of the next 280 vacancies to blacks or Hispanics. In 1979, the district court entered another hiring order. This order directed that the 50 percent minority hiring ratio should be maintained for the immediate future, and it retained the long-range goal of substantially increasing the minority composition of the CFD.

Although the priority was to hire blacks and Hispanics, CFD promotion practices were also at issue. The 1973 Department of Justice suit challenged the promotional tests and eligibility lists used by CFD in the 1960's and early 1970's. Cole Aff. ¶ 9. CFD administered new promotional examinations in 1978. Nevertheless, in 1980, the Department of Justice advised the city that it intended to file a new lawsuit challenging these examinations as having a severe adverse impact on minority candidates. Cole Aff. ¶¶ 11, 13. The results of the captains examination

showed that whites outscored blacks on the written portion at a statistically significant level of more than three standard deviations. On the performance evaluation, a subjective component involving ratings by supervisors, whites fared better than blacks and Hispanics at a statistically significant level of four standard deviations. Soule Aff. ¶¶ 11(a), 11(b). Promotional examinations for other ranks showed even greater disparities; on the engineers and lieutenants examinations, for example, whites outscored blacks and Hispanics on the subjective performance evaluations at factors of 11 and 12 standard deviations respectively.[2] Soule Aff. ¶¶ 4(b), 7(c). The city entered into another settlement agreement with the United States, this time addressing promotional practices. The city agreed to a long-term goal of increasing minority composition at each promotional rank to mirror the racial composition at the preceding rank. Def. 12(n) Ex. G.

In 1980, the city entered into a collective bargaining agreement with its firefighters. Section 9.3B of the agreement provides that promotions are "customarily" to be made in rank order, but that non-rank order promotions may be made to comply with affirmative action ordered by a court and in other enumerated circumstances. Def. 12(n) Ex. H, p. 15–16. This provision has twice been interpreted by arbitrators to permit non-rank order promotions for affirmative action purposes. Def. 12(n) Ex. J, K. Appendix G to the collective bargaining agreement requires the fire department to strive for as close to 45 percent minority representation in all ranks as is reasonably achievable and as quickly as reasonably possible. Def. 12(n) Ex. H, Appendix G.

### B. Promotions At Issue

The current plaintiffs enter the picture at this point. Because the 1979 captain eligibili-

---

2. The Second Circuit recently explained:

[s]tandard deviation analysis measures the probability that a result is a random deviation from the predicted result—the more standard deviations the lower the probability the result is a random one. Social scientists consider a finding of two standard deviations significant, meaning there is about one chance in 20 that the explanation for a deviation could be random and the deviation

must be accounted for by some factor other than chance. A finding of two or three standard deviations (one in 384 chance the result is random) is generally considered highly probative of discriminatory treatment.

*Billish v. Chicago*, 962 F.2d 1269, 1285 (7th Cir.1992), *rev'd*, 989 F.2d 890 (7th Cir.1993) (*en banc*) (quoting *Waisome v. Port Auth.*, 948 F.2d 1370, 1376 (2d Cir.1991) (citations omitted)).

ty list was becoming stale, and because CFD was unable to make significant progress in increasing the proportion of minority captains using that list,[3] CFD decided to generate a new eligibility list. In 1986, CFD administered a new captains examination and used the results to create a new eligibility list for captains ("the 1987 list"). Eligibility required a passing score of 70. The examination was validated as being job related, but was not validated for strict rank order promotions. Joyce Aff. ¶¶ 10–22, 28. CFD expected to promote 150 individuals off the list over its three-year expected life. If strict rank order were used, 14 percent and 4.7 percent of the captain promotions would be black and Hispanic respectively. Def. 12(n) Ex. O. CFD, citing its consent decrees, the collective bargaining agreement, and its institutional belief that CFD's prior promotion practices were discriminatory, believed that its affirmative action obligations required it to do better. Def. 12(n) Ex. O. As a result, CFD decided to promote captains on an affirmative action basis so that 20 percent of those promoted to captain off the 1987 list would be black and five percent Hispanic. *Id.*

The plaintiffs are white lieutenants who took the 1986 captains examination, received passing scores, and achieved rankings on the 1987 list between 136 to 166. On May 1, 1991, the city made 12 promotions, bringing to 142 its total number of promotions off the 1987 list. Pl. 12(n) ¶ 14. The city promoted through rank 131 in sequence and promoted three black or Hispanic candidates below rank 131.[4] Plaintiffs Graf (rank 136), Scavone (138), and Sobczak (139) would have

been promoted on May 1, 1991 if the promotions had been made in strict rank order. The CFD made 18 more promotions on April 1, 1992, for a total of 160 promotions. Promotions on April 1 were made in rank order through rank 150. A grand total of 14 blacks and Hispanics on the 1987 list below rank 150 were promoted over the life of the list. Amended Compl. ¶ 14 & Ex. G. Because CFD partially digressed from strict rank order promotions, the remaining plaintiffs were not promoted by April 1, 1992: McNamara (rank 152), Sullivan (153), Miller (154), Lux (157), King (159), and Dineen (166).[5]

Every black and Hispanic lieutenant promoted out of rank order had passed the captains examination and was qualified to assume the rank of captain. Moreover, because the 1986 captains examination had a margin of error, scores differing by less than 7.5 points were insufficiently different by themselves to justify selection of one candidate over another. Barrett Aff. ¶¶ 9–12. In fact, the difference in scores between the last candidate promoted in strict rank order off the 1987 list (Ruhnke) and the last minority candidate promoted out of rank order (Rabiela) was less than seven points. Pl. 12(m) ¶ 62.

### C. Prior Related Litigation

Affirmative action promotions off the 1987 list have been the subject of litigation previously. In *Chicago Fire Fighters Union Local No. 2 v. Washington,* 736 F.Supp. 923 (N.D.Ill.1990), white firefighters challenged the constitutionality of CFD's affirmative action policies. Judge Holderman considered the equal protection challenge, applied strict

---

3. As of June 1987, 3.6 percent of all captains were black or Hispanic. 13.6 percent of lieutenants were black or Hispanic. The difference between the expected percentage of blacks and Hispanics in the captain rank and the observed percentage was 3.96 standard deviations. Joyce Supp. Aff. ¶ 2. The court expresses no opinion on the cause of this disparity, for the Seventh Circuit has admonished that factors other than actionable discrimination may be responsible for the lack of blacks and Hispanics in CFD's upper ranks. *See Billish v. Chicago,* 989 F.2d 890, 896 (7th Cir.1993) (*en banc*).

4. The total number of promotions is larger than the sum of the last in-rank number and the

number of affirmative action promotions. The higher number of actual promotions reflects several affirmative action promotions made off the 1987 list in previous years; those promotions are not at issue in this case. The court also notes that several candidates on the 1987 list who ranked higher than 131 apparently died, retired, or otherwise were ineligible for promotion when their number came due.

5. Although ranked 166th, Dineen would have been promoted on April 1 because several higher-ranked candidates became ineligible for promotion after the 1987 list was created.

scrutiny, and granted summary judgment in favor of the defendants, thereby upholding the city's affirmative action policy. A divided appellate panel affirmed, holding that the plaintiffs presented no issue of fact contesting the city's position that its affirmative action policy was justified by the lingering effects of prior discrimination in the CFD. *Billish v. Chicago,* 962 F.2d 1269 (7th Cir. 1992). Nevertheless, the Seventh Circuit reheard the case *en banc* and, by a 5–4 vote, reversed the panel's decision. The court held that a trial was necessary to determine whether the city's affirmative action policy passed muster under strict scrutiny—that is, whether the city had a strong basis in evidence to conclude that there were lingering effects of discrimination in the CFD's higher ranks and whether the affirmative action plan was narrowly tailored to eliminate all remnants of that discrimination. *Billish v. Chicago,* 989 F.2d 890, 896–97 (7th Cir.1993). (*en banc* ).

## DISCUSSION

### I. *Plaintiffs' Motion To Reconsider*

 The plaintiffs move the court to reconsider its August 31st order granting qualified immunity to the individual defendants and denying the plaintiffs' motion for summary judgment on the issue of "liability." Motions for reconsideration serve a narrow purpose. The rulings of a district court "are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure." *Quaker Alloy Casting Co. v. Gulfco Indus., Inc.,* 123 F.R.D. 282, 288 (N.D.Ill.1988). A motion for reconsideration will be granted only to correct manifest errors of law or to present newly discovered evidence. *Lewis v. Hermann,* 783 F.Supp. 1131, 1132 (N.D.Ill.1991) (citing *Publishers Resource, Inc. v. Walker–Davis Publications, Inc.,* 762 F.2d 557, 561 (7th Cir.1985)). The motion is not a vehicle to introduce new evidence or legal theories that could have been raised in the original motion. *Id.* Rather, a motion for reconsideration is appropriate only when "the Court has patently misunderstood a party ... or has made an error not of reasoning but of apprehension." *Bank of Waunakee v. Rochester Cheese*

*Sales, Inc.,* 906 F.2d 1185, 1191 (7th Cir. 1990).

### A. **Qualified Immunity**

 Qualified immunity protects government officials performing discretionary functions from civil liability if their conduct violates no "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The doctrine allows government officials to perform their duties free from the specter of most civil liability. *See Davis v. Scherer,* 468 U.S. 183, 196, 104 S.Ct. 3012, 3020, 82 L.Ed.2d 139 (1984). "Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was *knowingly* violating the law would have done such a thing, the government actor has immunity from suit." *Lassiter v. Alabama A & M Univ., Bd. of Trustees,* 28 F.3d 1146, 1149 (11th Cir.1994) (emphasis added). Rights are clearly developed when they are so sufficiently concrete and defined that the government actor knows that "what he is doing" violates federal law. *See Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Moreover, plaintiffs cannot defeat a qualified immunity defense invoking general propositions of rights; instead, qualified immunity turns on the actual circumstances in which the government official acted. *Lassiter,* 28 F.3d at 1150. The issue is "whether the law was clear in relation to the specific facts confronting the public official when he acted." *Colaizzi v. Walker,* 812 F.2d 304, 308 (7th Cir.1987). Thus, pre-existing law must "truly compel (not just suggest or allow or raise a question about)[ ] the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances.*" *Lassiter,* 28 F.3d at 1150 (emphasis in original).

Instead of showing that the court misconstrued the legal arguments or facts raised in their original motion, the plaintiffs merely reassert those arguments, claiming that the actions of the individual defendants were unlawful because they were committed after the

Supreme Court's decision in *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 501, 109 S.Ct. 706, 725–26, 102 L.Ed.2d 854 (1989). Although *Croson* expressed a general rule against discrimination, it explicitly condoned affirmative action to right situations where the effects of past discrimination lingered and required remedy. *See Croson*, 488 U.S. at 493, 109 S.Ct. at 721–22.

■ The individual defendants here are clearly entitled to qualified immunity. No court has held that affirmative action is *per se* unconstitutional. To the contrary, courts recognize that affirmative action may be permissible to remedy past discrimination. *See Croson*, 488 U.S. at 493, 109 S.Ct. at 721–22; *United States v. Paradise*, 480 U.S. 149, 167, 107 S.Ct. 1053, 1064, 94 L.Ed.2d 203 (1987); *Hazelwood School District v. United States*, 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741–42, 53 L.Ed.2d 768 (1977). More significantly, the affirmative action plan at issue had been expressly upheld as lawful by a federal district court one year before the first round of promotions that the plaintiffs now attack. *See Chicago Fire Fighters Union Local No. 2 v. Washington*, 736 F.Supp. 923 (N.D.Ill. 1990). The Seventh Circuit affirmed the decision one month after the second and final round of promotions at issue. *See Billish v. Chicago*, 962 F.2d 1269 (7th Cir.1992) (decided May 4, 1992). Although that decision was subsequently reversed by the Seventh Circuit, the *en banc* court offered no opinion on the legality of affirmative action plan. Instead, the court held that a trier of fact must determine if the plan is lawful by determining whether it satisfies strict scrutiny. *See Billish v. Chicago*, 989 F.2d 890 (7th Cir. 1993) (*en banc*) (vacating summary judgment order and remanding for trial). Although the district court upheld CFD's affirmative action policies one year before the promotions at issue here, the plaintiffs present no evidence that law or facts changed

significantly after the decision. Thus, the most reasonable conclusion is that the individual defendants believed, and were entitled to believe, that their actions were lawful. Indeed, their actions may still be found lawful, although that conclusion must await trial. In any event, it cannot be said that the individual defendants violated "clearly established" rights.[6]

### B. "Liability"

■ The plaintiffs also challenge the court's August 31st denial of the plaintiffs' motion for summary judgment on the issue of "liability." In the original motion for summary judgment, the plaintiffs' "liability" argument consisted of one page devoted exclusively to the proposition that "[t]he union contract, Appendix G, violates the equal protection clause." The thrust of the argument was that racial preferences, as a matter of law, were *per se* unconstitutional. The court held that the "plaintiffs' conclusory [legal] argument does not warrant summary judgment." August 31, 1994 Mem. Opinion and Order at 7. Indeed, *Croson* and other cases teach that racial preferences are constitutionally tolerable if they survive strict scrutiny. *See Croson*, 488 U.S. at 509, 109 S.Ct. at 730. Following *Billish*, 989 F.2d at 897, the court also held that issues of fact existed as to the equal protection claim on the question of whether the city's affirmative action plan was justified to remedy past discrimination. *See* August 31, 1994 Mem. Opinion and Order at 6.

Apparently, the plaintiffs now ask the court to consider at once, generally and without differentiation under the term "liability," all of their substantive claims. Identifying the substantive claims is not easy; neither the complaint nor the plaintiffs' current brief is a model of clarity or organization. Nevertheless, several probable claims may be dis-

---

**6.** It is noteworthy that Judge Holderman granted qualified immunity to the individual defendants in the original decision. *See Chicago Fire Fighters,* 736 F.Supp. at 933. Neither appellate court reviewing the case took issue with Judge Holderman's conclusions on qualified immunity; Judge Holderman noted that his qualified immunity ruling was independent of his decision to grant summary judgment on the merits. *See id.* at 933;

*Lassiter,* 28 F.3d at 1151 ("[a] decision on qualified immunity is separate and distinct from the merits of the case"). Because of that silence, and because the circumstances (such as minority representation in CFD's higher ranks) did not change significantly before the promotions at issue, the court deems Judge Holderman's findings persuasive.

cerned. These include a section 1983 equal protection claim, Title VII claims premised on disparate treatment and disparate impact, and a section 1981 claim. The plaintiffs also take issue with the city's version of the facts, as presented in the city's motion for summary judgment.

As stated above, a motion for reconsideration is neither a forum for new evidence nor a vehicle to restate old arguments with renewed vigor. The plaintiffs improperly attempt to have the court consider all of their substantive claims, as well as their newly-presented introduction and interpretations of evidence. The plaintiffs do not show that the court misconstrued their original argument—that the prescriptions for racial preference in appendix G of their collective bargaining agreement are *per se* unconstitutional. In any event, *Billish* considered the same affirmative action policies at issue here on cross motions for summary judgment and held that a trial was necessary on the equal protection claim to resolve issues of fact as to whether the city's policies were justified under strict scrutiny. *See Billish,* 989 F.2d at 897. *Billish* considered the same arguments and the same evidence as the plaintiffs present here. Therefore, the plaintiffs do not meet their burden on a motion for reconsideration and are otherwise precluded from summary judgment on the equal protection claim by *Billish.* The motion to reconsider must be denied in its entirety.

## II. City's Motion For Summary Judgment

On cross motions for summary judgment concerning the same affirmative action policy at issue here, *Billish* reversed a grant of summary judgment in favor of the city and ordered a trial on the equal protection claim. *Billish,* 989 F.2d at 897. Because *Billish* is controlling, the city does not move for summary judgment on the equal protection claim. A trial is necessary on the equal protection claim.

■■■ The city does move for summary judgment on the plaintiffs' Title VII and § 1981 claims.[7] A movant is entitled to summary judgment under Federal Rule of Civil Procedure 56 when the moving papers and affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Unterreiner v. Volkswagen of Am.,* 8 F.3d 1206, 1209 (7th Cir. 1993). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Becker v. Tenenbaum–Hill Assoc., Inc.,* 914 F.2d 107, 110 (7th Cir.1990). The court considers the record as a whole, and draws all reasonable inferences in the light most favorable to the party opposing the motion. *Fisher v. Transco Services–Milwaukee, Inc.,* 979 F.2d 1239, 1242 (7th Cir.1992). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Stewart v. McGinnis,* 5 F.3d 1031, 1033 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1075, 127 L.Ed.2d 393 (1994).

### A. Title VII

Plaintiffs raise claims of disparate impact and disparate treatment under Title VII.

7. The city also moves for summary judgment on the "appendix G claim." The city reads the complaint as containing a facial challenge to appendix G, the affirmative action provision of the collective bargaining agreement. The court disagrees with this interpretation. CFD's affirmative action policies come from several different sources, only one of which is appendix G. Although their purpose is unclear, the plaintiffs appear to include the appendix G allegations in the complaint in order to buttress factually their section 1983 equal protection and their Title VII disparate treatment claims, as well as to impli-

cate the individual defendants by alleging that the individual defendants were responsible for the inclusion of this allegedly unconstitutional provision in the collective bargaining agreement. *See* Amended Compl. ¶ 17. Read in this manner, the plaintiffs appear to challenge appendix G as applied to them, and the "appendix G claim" may thus be fairly subsumed into the equal protection and Title VII claims. The constitutionality of CFD's affirmative action policies will be decided at trial, and that decision will dictate whether CFD may enforce appendix G of the collective bargaining agreement.

**748**

### 1. Disparate impact

 The plaintiffs allege that the 1986 captains examination had an adverse impact on white candidates. Before filing a civil lawsuit, a Title VII plaintiff is required to file a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") and receive a right-to-sue letter. *See Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974); 42 U.S.C. § 2000e–5(f)(1). This procedure allows the EEOC to engage in an investigatory and conciliatory function designed to solve the problem before lawsuits are undertaken. In order to vindicate this policy, the general rule is that only those claims that are fairly encompassed within an EEOC charge may be the subject of a resulting lawsuit. *Chambers v. American Trans Air*, 17 F.3d 998, 1003 (7th Cir.1994); *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 127 (7th Cir.1989). Thus, only discrimination claims that are "like or reasonably related to the allegations of the charge and growing out of such allegations" may be pursued in a lawsuit. *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 864 (7th Cir. 1985) (quoting *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164, 167 (7th Cir. 1976) (*en banc*)). The relevant inquiry is what scope of EEOC investigation could reasonably be expected to grow from the original EEOC complaint. *Schnellbaecher*, 887 F.2d at 127.

 This standard requires dismissal of the plaintiffs Title VII adverse impact claim. The EEOC charges filed by the plaintiffs are identical. Def. 12(n) Ex. A. The charges allege only that (1) CFD discriminated against the plaintiffs by promoting blacks and Hispanics out of rank order, and (2) that appendix G of the collective bargaining agreement implements an unwarranted affirmative action policy. The only Title VII claim "fairly encompassed" in these charges is disparate treatment—that CFD intentionally discriminated against whites and in favor of blacks and Hispanics by consciously promoting blacks and Hispanics out of rank order. A disparate impact claim is not fairly encompassed in the EEOC charge. The disparate impact claim as alleged in the complaint charges that the captains examination actually had an adverse impact on whites. This claim is distinct from disparate treatment and would not reasonably be expected to grow out of an EEOC investigation into intentionally promoting captains out of rank order because of race. Under the charge it received from the plaintiffs, the EEOC would not be concerned with how the rankings were generated, but rather why CFD was not faithful to those rankings. As a result, summary judgment must be granted in favor of the city and against all plaintiffs on the disparate impact claim.

### 2. Disparate treatment

 Plaintiffs also allege a Title VII claim for disparate treatment, which was the exclusive subject of the EEOC charge. At the outset, the court finds that plaintiffs Graf, Scavone, and Sobczak did not file EEOC charges contesting the affirmative action promotions. As a result, these plaintiffs may not maintain a Title VII claim here. 42 U.S.C. § 2000e–5(f)(1). The plaintiffs concede as much. *See* Pl.Mem. Opp.Mot.Sum.Judg. at 17.

 Title VII makes it unlawful for an employer to discriminate against an employee because of race. *See* 42 U.S.C. § 2000e–1. Title VII allows (but does not "require") employers to develop voluntary affirmative action plans designed to "further[ ] Title VII's purpose of eliminating the effects of discrimination in the workplace." *Johnson v. Transportation Agency*, 480 U.S. at 630, 107 S.Ct. at 1451; *see United Steelworkers v. Weber*, 443 U.S. 193, 204, 99 S.Ct. 2721, 2728, 61 L.Ed.2d 480 (1979). Such plans are consistent with Title VII's goal of "break[ing] down old patterns of racial segregation and hierarchy." *Johnson*, 480 U.S. at 628, 107 S.Ct. at 1450 (quoting *Weber*, 443 U.S. at 208, 99 S.Ct. at 2730). Nevertheless, employers must ensure that while their affirmative action plans further Title VII's purpose, they do not unduly infringe the interests of nonminority employees. *Id.*

 The plaintiffs have the ultimate burden of demonstrating that CFD's affirmative action program violates Title VII. Analysis

of whether the plaintiffs meet their burden proceeds under the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Johnson v. Transportation Agency*, 480 U.S. 616, 626, 107 S.Ct. 1442, 1449, 94 L.Ed.2d 615 (1987). Under this standard:

> Once a plaintiff establishes a prima facie case that race or sex has been taken into account in an employer's employment decision, the burden shifts to the employer to articulate a nondiscriminatory rationale for its decision. The existence of an affirmative action plan provides such a rationale. If such a plan is articulated as the basis for the employer's decision, the burden shifts to the plaintiff to prove that the employer's justification is pretextual and the plan is invalid.

*Johnson*, 480 U.S. at 626, 107 S.Ct. at 1449.

■■■ An affirmative action plan is valid under Title VII if it (1) is adopted and designed to correct "manifest racial imbalances in traditionally segregated job categories," and (2) does not "unnecessarily trammel the interests of white employees." *Johnson*, 480 U.S. at 628–30, 107 S.Ct. at 1450–51 (citing *Steelworkers v. Weber*, 443 U.S. 193, 197, 208, 99 S.Ct. 2721, 2724, 2729 (1979)). Title VII's criteria for validation of an affirmative action plan are different and less stringent than the standards used in an equal protection analysis. *See Johnson*, 480 U.S. at 629 n. 7, 107 S.Ct. at 1450 n. 7. In an equal protection inquiry, the affirmative action plan must survive "strict scrutiny." Under strict scrutiny, there must be a compelling reason for the plan—such as a "strong basis in evidence" that the plan is necessary to remedy lingering effects of past discrimination—and the plan must be narrowly tailored to the goal of eliminating the vestiges of past discrimination. *See Billish*, 989 F.2d at 893. In contrast, the Title VII standards are designed to ensure only that the "purposes of the plan mirror those of the statute" and that the effects of the plan on nonbeneficiaries are not intolerably onerous. *See Weber*, 443 U.S. at 208, 99 S.Ct. at 2730; *United States v. Board of Educ.*, 832 F.Supp. 836, 844 (D.N.J.1993). Thus, an affirmative action plan that is valid under Title VII may nevertheless constitute an equal protection violation.

The plaintiffs easily establish a *prima facie* case: the city admits it selected lower-ranked candidates for the captain position before plaintiffs because the lower-ranked candidates were black or Hispanic.

The city responds that its selections were made pursuant to an affirmative action program. At this point, the burden of production shifts back to the plaintiffs who, to avoid summary judgment, must establish that an issue of fact exists as to whether the affirmative action plan is valid under Title VII. The plaintiffs spend considerable time attacking the city's assertion that the affirmative action program is necessary to combat past discrimination within the CFD, as well as the city's claim that the effects of that discrimination continue to linger. To this end, the plaintiffs contest the causes for segregated fire houses, the use of "snapshot statistics" by the city to prove racial imbalance, the claim that previous captain examinations adversely affected minorities, and the probative value of the fact that the city has been sued by the United States for discrimination in CFD and has entered into consent decrees several times.

The plaintiffs' arguments are more relevant to an equal protection claim than to the Title VII claim.[8] The validity of an affirmative action plan under Title VII is concerned with two discrete factors: whether the purpose and design of the plan is to correct a manifest racial disparity in some part of the employer's workforce and whether the plan unduly trammels on the rights of nonminority employees.

---

8. As noted above, the plaintiffs have raised sufficient factual issues to justify a trial on their equal protection claim. Significantly, the plaintiffs do not argue Title VII in their brief except to concede that Graf, Scavone, and Sobczak may not maintain a Title VII claim because of their failure to file an EEOC charge. The plaintiffs generally contest the city's version of facts, but the plaintiffs do not apply their arguments to any claim in particular. Nevertheless, the tone of the plaintiffs' factual arguments and the cases they cite strongly suggest that the factual discussion is meant to inform the equal protection debate, which is not at issue in the city's summary judgment motion.

The first standard, whether the plan was adopted to correct a "manifest racial imbalance," is fairly objective. An employer seeking to justify adoption of the affirmative action plan under Title VII "need *not* point to its own prior discriminatory practices, nor even to evidence of an 'arguable violation' on its part." *Johnson*, 480 U.S. at 630, 107 S.Ct. at 1451 (emphasis added); *Weber*, 443 U.S. at 212, 99 S.Ct. at 2731–32 (Blackmun, J., concurring). Instead, the employer need only show a "conspicuous [or manifest] racial imbalance in traditionally segregated job categories." *Weber*, 443 U.S. at 209, 99 S.Ct. at 2730 (Blackmun, J., concurring). A "manifest imbalance" is less than a disparity needed to make out a *prima facie* Title VII violation. *Johnson*, 480 U.S. at 632, 107 S.Ct. at 1452.

The city satisfies the first requirement. Although many affirmative action "plans" appear in this litigation, the one most relevant to the plaintiffs is the plan adopted on July 9, 1987 in a letter from Personnel Commissioner Hoskins to Fire Commissioner Galante. Def. 12(n) Ex. O. CFD adopted the plan after it received the results and rankings of the 1987 captains examination. At that time, only 3.6 percent of captains were black or Hispanic. In contrast, 13.6 percent of lieutenants, the rank from which captains were promoted, were black or Hispanic. Def. 12(n) ¶ 43. The difference between the expected percentage of blacks and Hispanics in the captain rank and the observed percentage was 3.96 standard deviations, a significant and suspicious disparity. Joyce Supp.Aff. ¶ 2; *see Castaneda v. Partida*, 430 U.S. 482, 497 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977). CFD predicted that it would promote 150 individuals off the 1987 captain eligibility list during the three-year expected life of the list. Def.

12(n) Ex. O. CFD realized, however, that only 14 percent and 4.7 percent of the promotions would be to blacks and Hispanics if strict rank order were followed. As a result, CFD determined that it would promote with the "goal" that 20 percent of the captain promotions would be to blacks and 5 percent to Hispanics. Def. 12(n) Ex. O. CFD believed its actions were warranted because of its obligations under the 1980 consent decree, its obligations under appendix G of the collective bargaining agreement, and its own realization that "dramatically more improvement is needed to correct the effects of such a long history of [our] discrimination." *Id.* at 2.

Because promotions were to be made off a static list, CFD knew exactly who would be promoted, their examination scores, and the order of promotions; the affirmative action hiring goals were developed in light of this information. Significantly, the affirmative action plan stressed that its hiring goals were informed by considering the qualifications of the candidates. As everyone on the eligibility list had received a passing score on the test, the modest affirmative action hiring goals ensured that no one unqualified would be promoted. *Id.* at 4. In addition, assuming that 150 persons would be promoted, the city predicted that the difference in test scores between the lowest in-rank candidate promoted and the lowest affirmative action candidate promoted would be less than 1.5 points on a 100–point scale, a spread that made no difference in terms of qualifications for the rank of captain.[9] *Id.*

This plan survives the first prong of Title VII review. Statistically, a "manifest imbalance" of 3.96 standard deviations existed between the captain rank and the lieutenant rank at the time the plan was adopted.[10]

---

**9.** The city's predictions were fairly accurate. In actuality, 160 persons were promoted off the 1987 list before it was retired. The difference between the last in-rank candidate promoted and the last affirmative action candidate was less than seven points. A difference of less than 7.5 points is insufficient to justify choosing one candidate over another. Barrett Aff. ¶ 12.

**10.** The plaintiffs decry the use of "snapshot statistics" to establish this factor, noting that minority representation in the captain rank had in-

creased somewhat by 1989. The argument that minority representation increased after rounds of affirmative action promotions is unexceptional. Moreover, it does not undermine the validity of the affirmative action plan. The first Title VII standard is designed to validate the *purpose* of the plan, to ensure that the plan was not adopted to play racial politics, but rather was intended to vindicate the policies behind Title VII. The Supreme Court has held that an affirmative action plan is consonant with the purposes of Title VII

These ranks were traditionally segregated. Like the plan approved in *Johnson,* the uncontroverted evidence in this case suggests that CFD's affirmative action plan for the 1987 list was adopted for the purpose of remedying underrepresentation at the rank of captain. *See Johnson,* 480 U.S. at 634, 107 S.Ct. at 1453. The plaintiffs offer no evidence that the affirmative action plan was a guise for invidious discrimination or was adopted for any other reason inconsistent with the spirit of Title VII. Moreover, like in *Johnson,* CFD's plan did not authorize blind hiring without concern for qualifications. *See Johnson,* 480 U.S. at 635, 107 S.Ct. at 1453–54. Instead, the plan ensured not only that every individual promoted would be qualified, but that every individual's qualifications would be statistically indistinguishable from every other individual's. As a result, the court finds that the plan is valid under the first prong of Title VII analysis. Whether the city was justified in adopting the plan as a constitutional matter must await an equal protection determination at trial.

In addition to having a valid purpose, a valid affirmative action plan must avoid "unnecessarily trammel[ling] the interests" of nonminority employees. *See Weber,* 443 U.S. at 208. Although there is no precise formula for determining if an affirmative action plan unnecessarily trammels on the interests of nonbeneficiaries, the Supreme Court has hinted at several factors to be used in the calculus. Thus, the Court has approved plans under this standard if they (1) did not require the discharge of white workers and their replacement by black workers; (2) did not create an absolute bar to the advancement of white workers; and (3) if they were a temporary measure designed to *attain* a racial balance, not maintain one. *Weber,* 443

U.S. at 208, 99 S.Ct. at 2729–30; *Johnson,* 480 U.S. at 638–40, 107 S.Ct. at 1455–56; *Board of Educ.,* 832 F.Supp. at 849. Moreover, express assurances that a program is temporary are needed if the program sets aside positions according to specific numbers. *Johnson,* 480 U.S. at 639–40, 107 S.Ct. at 1455–56.

CFD's affirmative action program for the 1987 list is valid under these factors. First, the plan does not require the discharge of white workers in favor of minority workers. Instead, the plan marginally limits the opportunities for immediate promotion of some white lieutenants. In assessing the impact of affirmative action plans, " '[d]enial of a future employment opportunity is not as intrusive as loss of an existing job,' and plainly postponement [of a promotion] imposes a lesser burden still." *United States v. Paradise,* 480 U.S. 149, 183, 107 S.Ct. 1053, 1072, 94 L.Ed.2d 203 (1987) (plurality opinion) (internal citations omitted) (quoting *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 283, 106 S.Ct. 1842, 1851–52, 90 L.Ed.2d 260 (1986)). Moreover, like in *Johnson,* the plaintiffs here did not have an absolute entitlement to a promotion to captain. Although the collective bargaining agreement provided that promotions would "customarily" be filled in order of ranking on the eligibility list, it also expressly provided a number of exceptions to rank-order promotions, including court-ordered affirmative action.[11] Def. 12(n) Ex. H. Finally, CFD chose its hiring goals modestly in order to "not unduly burden other candidates for promotion." Def. 12(n) Ex. O.

Second, CFD's affirmative action plan did not constitute an absolute bar to the promotion of whites. Although the plaintiffs were initially denied a promotion, they "re-

---

if the evidence shows that it was adopted to correct a manifest imbalance in traditionally segregated job categories. *See Johnson,* 480 U.S. at 630–33, 107 S.Ct. at 1451–53 ("Our decision [in *Weber*] was grounded in the recognition that voluntary employer action can play a crucial role in furthering Title VII's purpose of eliminating the effects of discrimination in the workplace, and that Title VII should not be read to thwart such efforts"). As a result, the statistics at the time the plan was adopted are probative of whether the city had a good-faith purpose in adopting the plan. Whether the cause of the disparity is past discrimination is not relevant to Title VII analysis.

11. The court expresses no opinion on whether the affirmative action plan was "ordered by a court" by virtue of the consent decrees. *See Billish,* 989 F.2d at 893–94. The point is that the exceptions in the collective bargaining agreement vitiated any absolute entitlement to promotion on a strict rank order basis.

tained [their] employment with [CFD], at the same salary and with the same seniority, and remained eligible for other promotions." *Johnson,* 480 U.S. at 638, 107 S.Ct. at 1455. Indeed, several of the plaintiffs received promotions before the 1987 list was retired. All of the plaintiffs remain eligible for promotions.

Finally, the affirmative action plan was a temporary measure designed to eliminate a racial imbalance and not to maintain a racial balance. *See Johnson,* 480 U.S. at 639, 107 S.Ct. at 1455–56; *see also* Def. 12(n) Ex. O at 4 ("We also wish to emphasize that these goals are temporary ones designed to remove the effects of past discrimination, not to maintain racial balance once the effects of past discrimination have been corrected."). The plan was slated to last only for the life of the 1987 list, which CFD expected to be three years. In addition, the affirmative action goals were to be reevaluated on an annual basis in order "to insure flexibility and to guarantee that the ratios are used only so long as they are necessary and appropriate." Def. 12(n) Ex. O at 4–5. These safeguards ensured that CFD's plan would be used only to eliminate a racial imbalance and not to guarantee a permanent racial composition.

Bearing in mind "Congress' consistent emphasis on 'the value of voluntary efforts to further the objectives of the law,' " *Wygant,* 476 U.S. at 290, 106 S.Ct. at 1855 (O'Connor, J., concurring), and in the conspicuous absence of any facts or argument on the issue by the plaintiffs, the court holds that CFD's affirmative action plan is valid under Title VII. Accordingly, summary judgment is entered in favor of the city on all Title VII claims.

### B. Section 1981

The plaintiffs also assert discrimination claims under 42 U.S.C. § 1981, which prohibits discrimination in the (now-broadly interpreted) making and enforcement of contracts. The city's decision to promote out of rank order was made pursuant to its affirmative action policy. A race conscious employment decision made pursuant to a valid affirmative action plan is a defense to a section 1981 claim. *Setser v. Novack Inv. Co.,* 657

F.2d 962, 968 (8th Cir.), *cert. denied,* 454 U.S. 1064, 102 S.Ct. 615, 70 L.Ed.2d 601 (1981). The standards for determining the validity of an affirmative action plan are the same under both Title VII and section 1981. *See Setser,* 657 F.2d at 966–67; *International Brotherhood of Electrical Workers v. Hartford,* 625 F.2d 416, 425 (2d Cir.1980); *Frost v. Chrysler Motor Corp.,* 826 F.Supp. 1290, 1294 (W.D.Okla.1993). Because the court has determined that the city's affirmative action plan is valid under Title VII, it is also valid for the purposes of section 1981. Accordingly, the city is entitled to summary judgment on the section 1981 claims.

### CONCLUSION

The plaintiffs' motion to reconsider the rulings of August 31, 1994 is denied. The city's motion for summary judgment is granted in part and denied in part. Judgment is entered in favor of the city and against the plaintiffs on the Title VII claims of disparate impact and disparate treatment, as well as the section 1981 claim. The city's motion for summary judgment on plaintiffs' "appendix G" claim is denied as moot. The plaintiffs' equal protection claim remains; a trial is necessary to determine whether CFD's affirmative action policies survive strict scrutiny analysis.